STATE OF CONNECTICUT *v.* GERMAN MONTANEZ
(SC 17087)

Sullivan, C. J., and Norcott, Palmer, Vertefeuille and Zarella, Js.*

---

* The listings of justices reflects their senior status on this court as of the date of oral argument.

Argued October 28, 2005—officially released April 18, 2006

*Pamela S. Nagy*, special public defender, for the appellant (defendant).

*Rita M. Shair*, senior assistant state's attorney, with whom were *James E. Thomas*, state's attorney, and, on the brief, *Sandra L. Tullius* and *Donna Mambrino*, senior assistant state's attorneys, for the appellee (state).

*Opinion*

ZARELLA, J. The defendant, German Montanez, appeals from the judgment of conviction, rendered after a jury trial, of two counts of manslaughter in the first degree with a firearm as an accessory in violation of General Statutes §§ 53a-55a (a) and 53a-8, and one count of assault in the first degree as a principal or accessory in violation of General Statutes §§ 53a-59 (a) (5) and 53a-8. On appeal, the defendant claims that the trial court improperly: (1) instructed the jury regarding the principle of general intent; (2) instructed the jury regarding the "combat by agreement" exception to self-defense; and (3) failed to instruct the jury that, in the context of accessorial liability, self-defense properly may be considered from the perspective of the principal actor. We agree with the defendant's third claim, which is dispositive of this appeal. We accordingly reverse the judgment of the trial court and remand the case for a new trial. We also address the merits of the defendant's

first and second claims because they are likely to arise on retrial.[1]

The jury reasonably could have found the following facts regarding the relevant events and the physical setting in which they occurred. The rectangular property at 37-39 School Street in Hartford is approximately fifty feet wide and 175 feet deep. It abuts School Street to the north, another residential property to the west, a supermarket's loading dock area to the south, and a large, paved parking lot of a convalescent home to the east (large parking lot).

Near the front of the property, facing School Street, stands a three-story apartment house nearly as wide as the property itself. Behind the apartment house is a paved parking area equally as wide as the property. The parking area is connected to School Street only by a nine foot wide driveway that abuts the apartment house on the west and the property line on the east. With the exception of the side of the property abutting School Street, the property is surrounded by hedges approximately ten feet in height or a chain link fence approximately six feet in height or both. Thus, aside from a well traveled breach in the fence at the extreme back of the property, i.e., the southern property line, the driveway forms the sole means of access to and from the parking area.

The apartment house has a front interior stairwell facing School Street and a back interior stairwell leading into the parking area. Each apartment in the building is accessible through both the front and back stairwells.

---

[1] The defendant also claims that the trial court: (1) improperly instructed the jury regarding proximate cause; (2) incorrectly instructed the jury when the use of deadly force in self-defense is justified; and (3) improperly instructed the jury regarding the "incapacitation" exception to self-defense. We decline to address these claims because we cannot conclude that they are likely to arise on retrial. E.g., *State* v. *DeJesus*, 270 Conn. 826, 828 n.5, 856 A.2d 345 (2004).

The defendant moved into an apartment at 37-39 School Street[2] sometime in the summer of 1995 and, after arriving, intermittently exchanged dirty looks with David Arce, a resident of the neighborhood. Shortly before dusk on the evening of August 14, 1995, Arce encountered the defendant and the defendant's friend, Jorge Ramos, on the sidewalk in front of 37-39 School Street. The defendant asked Arce why he was "staring at him wrong." Arce replied that if the defendant had a problem with him, he should say so. While displaying a pistol tucked in his waistband, Ramos urged Arce to fight with the defendant. Arce declined to fight but left the area indicating that he would return with his brother, Angel Arce.

David Arce, who had been drinking beer before encountering the defendant and Ramos, returned to School Street a few minutes later with his older brother, Angel Arce, who also had been drinking.[3] The Arces' friends, Robert Brown and Randy Medina, joined them in the large parking lot adjacent to 37-39 School Street. The defendant and Ramos then confronted the Arces and their friends as they were standing in the large parking lot. Ramos quickly removed his gun from his waistband and pointed it at Angel Arce. Angel Arce told Ramos to "put the gun down" and invited Ramos to "fight man-to-man . . . ." Angel Arce also told Ramos, "if you're gonna pull the trigger . . . pull it, [I'm not] afraid to die." Ramos pulled the trigger, but his gun "click[ed]," and he then struck Angel Arce with his free hand. Brown accused Ramos of brandishing an

---

[2] The evidence is unclear as to whether the defendant lived on the first floor or the third floor of the apartment house. Although Glorimel Rosa, the defendant's former neighbor, testified that the defendant had resided on the third floor and had relatives who lived on the first floor, James C. Rovella, a former Hartford police detective, testified that the defendant's known address was on the first floor.

[3] Multiple witnesses testified, however, that no participants were intoxicated at the time of the incident.

unloaded gun. The defendant and Ramos slowly walked backward along the School Street sidewalk toward 37-39 School Street as the Arces' group followed them at a distance of one or two yards.

During the confrontation in the large parking lot, word had spread throughout the neighborhood that the Arces were being threatened at gunpoint. By the time that the defendant and Ramos reached the foot of the driveway at 37-39 School Street, the arrival of additional friends had swelled the size of the Arces' group to at least eight. The defendant and Ramos backed slowly down the driveway, Ramos on the side of the driveway nearest the fence and the defendant nearest the apartment house. As they did so, most of the Arces' group continued to follow them. Angel Arce led the group, walking toward the defendant and Ramos with his hands extended away from his body while maintaining a separation of one or two yards. Brown walked slightly behind and to the side of Angel Arce. Medina and David Arce followed behind Brown and Angel Arce, and other members of the group followed at various intervals along the driveway.

Angel Arce was shirtless throughout the encounter. This fact, combined with his conciliatory hand gestures, gave him the appearance of being unarmed. The other members of the Arces' group, however, did nothing to indicate to Ramos and the defendant that they were unarmed. As Angel Arce walked down the driveway of 37-39 School Street with the others in his group, he continued to instruct Ramos to put the gun down while Ramos repeatedly told the assembled group to "back up."

When the defendant and Ramos reached the back of the apartment house, the defendant ducked into the house's back stairwell. This motion went unnoticed by the members of the Arces' group, who continued to

advance toward Ramos into the parking area behind the apartment house. Approximately halfway between the back of the apartment house and the fence at the rear of the property, Ramos abruptly stopped walking backward. Brown began to move around Ramos' side while Angel Arce stood in front of Ramos. David Arce, perhaps sensing that the situation had arrived at a dangerous impasse, suggested to Angel Arce that they should "get out of here."

At that moment, the defendant reemerged from the back of the apartment house with a handgun and, from his position behind the Arces' group, opened fire in the direction of the group. Ramos also opened fire, first hitting Brown in the right leg and chest. Ramos then turned to Angel Arce and shot him once in the chest. Medina, David Arce and the other members of the Arces' group turned and ran up the driveway when the shooting began, retracing their steps toward School Street.[4] When they finished shooting, Ramos and the defendant fled, presumably through the breach in the fence at the rear of the property. Brown and Angel Arce both died at the scene from their gunshot wounds. Subsequent forensic testing revealed that Ramos had inflicted Brown's and Angel Arce's fatal wounds.[5]

The jury returned a guilty verdict against the defendant on all three counts with which he was charged, and the court rendered judgment in accordance with the jury's verdict, sentencing him to a total effective sentence of fifty-six years incarceration. The defendant

[4] David Arce sustained a gunshot wound to his buttocks but was not seriously injured. It could not be determined whether Ramos or the defendant was the source of that gunshot wound because the bullet from that wound never was recovered. This injury to David Arce formed the basis of the defendant's conviction of assault in the first degree as a principal or accessory.

[5] In fact, no bullets fired from the defendant's handgun were recovered from the remains of either Brown or Angel Arce.

appealed directly to this court pursuant to General Statutes § 51-199 (b) (3).

The defendant now challenges the trial court's jury charge on three grounds, each of which implicates a constitutional right. When a challenged jury instruction implicates a constitutional right, "the applicable standard of review is whether there is a reasonable possibility that the jury was misled in reaching its verdict." *State* v. *Whitford*, 260 Conn. 610, 619, 799 A.2d 1034 (2002). As we previously have stated, a jury charge is "considered in its entirety, read as a whole, and judged by its total effect rather than by its individual component parts," even when the appellant challenges only an individual component of the charge. (Internal quotation marks omitted.) *State* v. *DeJesus*, 260 Conn. 466, 473, 797 A.2d 1101 (2002). We analyze a challenged jury charge for its fair presentation of the case to the jury "in such a way that injustice is not done to either party under the established rules of law." (Internal quotation marks omitted.) Id. If the charge is "correct in law, adapted to the issues, and sufficient for the guidance of the jury," we will not deem it improper. (Internal quotation marks omitted.) Id.

I

The defendant first claims that the trial court improperly instructed the jury regarding both specific intent and general intent because the crimes with which the defendant was charged required only an instruction on specific intent.[6] See General Statutes § 53a-59 (a) (5)

---

[6] While the trial court did not cite a specific statute, this portion of its charge was clearly based on General Statutes § 53a-3 (11). The trial court instructed the jury that "a person [acts] intentionally with respect to [a] result or to conduct when his conscious objective is to cause such result or to engage in such conduct. . . . You may infer from the fact that the [defendant] engaged in conduct that he intended to engage in conduct." General Statutes § 53a-3 (11) provides: "A person acts 'intentionally' with respect to a result or to conduct described by a statute defining an offense when his conscious objective is to cause such result or to engage in such conduct . . . ."

(assault in first degree by means of discharge of firearm requires proof of "intent to cause physical injury to another person"); *State* v. *Bzdyra*, 165 Conn. 400, 403, 334 A.2d 917 (1973) (manslaughter in first degree requires proof of specific intent "to cause serious physical injury to another person" [internal quotation marks omitted]). The defendant argues that the trial court's instruction on general intent[7] "misled the jury into believing that [the] defendant could be guilty of [the crimes with which he was charged] if he had the intent to engage in the conduct of using a firearm without determining if [the] defendant meant to cause physical injury to the victims." The state replies that there was no reasonable possibility that the jury was misled because, the general intent instruction notwithstanding, "the [trial] court's instructions . . . clearly set out the specific intent element for each of the crimes charged, and [the court] reiterated [the] specific intent [element] throughout its instructions." We agree with the state.

The defendant failed to preserve this claim at trial[8] and now seeks to prevail under *State* v. *Golding*, 213 Conn. 233, 567 A.2d 823 (1989). *Golding* permits a defendant to "prevail on [an unpreserved] claim of constitutional error . . . only if all of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." Id., 239–40.

---

[7] The trial court instructed the jury on the principle of general intent twice and directly or indirectly referred to it another nine times, for a total of eleven references in the court's entire charge.

[8] The defendant neither requested a curative instruction nor took exception to the instruction that the trial court had given.

"[T]he first two [prongs of *Golding*] involve a determination of whether the claim is reviewable; the second two . . . involve a determination of whether the defendant may prevail." (Internal quotation marks omitted.) *State* v. *Whitford,* supra, 260 Conn. 621.

The state does not dispute that the first two prongs of *Golding* have been satisfied with respect to this claim. The record is adequate for review, and, when intent is an element of a crime, a trial court's failure to instruct the jury properly with respect to intent implicates the due process rights of the accused. See, e.g., *State* v. *DeJesus,* supra, 260 Conn. 472–73. We accordingly review the merits of the defendant's claim under the third and fourth prongs of *Golding.*

We have encountered a comparable factual situation in a number of our previous cases. In *State* v. *DeJesus,* supra, 260 Conn. 466, *State* v. *Austin,* 244 Conn. 226, 710 A.2d 732 (1998), and *State* v. *Prioleau,* 235 Conn. 274, 664 A.2d 743 (1995), the trial courts instructed the juries using the entire statutory definition of intent when only an instruction on specific intent was warranted. See *State* v. *DeJesus,* supra, 471–72 and n.6; *State* v. *Austin,* supra, 232–33 and n.8; *State* v. *Prioleau,* supra, 321–22. In each case, we found that the trial court's repeated instructions that specific intent is an element of the crime "eliminated any possibility of juror confusion with respect to the element of intent," notwithstanding the trial court's use of the unabridged statutory intent instruction.[9] *State* v. *DeJesus,* supra, 476; see also *State* v. *Austin,* supra, 236 ("any possible risk of jury confusion over the element of intent was eliminated by the trial court's numerous proper instructions on the elements of murder"); *State* v. *Prioleau,*

---

[9] In *Prioleau,* we found that the portion of the court's instruction concerning general intent was "irrelevant" to the prosecution of the crime charged. *State* v. *Prioleau,* supra, 235 Conn. 322.

supra, 322 (upholding jury charge when "the [trial] court repeatedly instructed the jury that in order to find the defendant guilty of murder, it first had to find that he had intended to cause the death of the victim").

The trial court in the present case repeatedly[10] instructed the jury that, to find the defendant guilty of either manslaughter count, "the state must prove . . . beyond a reasonable doubt . . . that the defendant . . . intended to cause serious physical injury to another person." The trial court also instructed the jury that, to find the defendant guilty of assault, "the state must prove beyond a reasonable doubt . . . [the defendant's] intent to cause physical injury to another person." Like the trial courts in *DeJesus*, *Austin* and *Prioleau*, the trial court in the present case unmistakably described the defendant's specific intent as an element of the crimes with which he was charged. The precedents of *DeJesus*, *Austin* and *Prioleau* accordingly control this issue.

The defendant nonetheless attempts to overcome these precedents by invoking *State* v. *DeBarros*, 58 Conn. App. 673, 755 A.2d 303, cert. denied, 254 Conn. 931, 761 A.2d 756 (2000), a case involving comparable facts but distinguishing *Austin* and *Prioleau* on two grounds.[11] First, the court in *DeBarros* concluded that the trial court's ten references to the principle of general intent were "too numerous to be rectified by the court's proper instructions." Id., 683. Second, the court in *DeBarros* noted that, unlike the jury charges at issue in *Austin* and *Prioleau*, the trial court's charge in *DeBarros* indicated that general intent was an element of the crime rather than merely "part of [the] general definition of intent." Id.

---

[10] The trial court did so four times during the course of its instruction regarding the first count of manslaughter, and three times during the course of its instruction regarding the second count of manslaughter.

[11] *DeBarros* predated *DeJesus* and therefore did not address that case.

The defendant's reliance on *DeBarros*, however, is misplaced. The latter ground on which *DeBarros* departed from *Austin* and *Prioleau* is inapplicable to the present case. As we noted previously in this opinion, the trial court repeatedly instructed the jury that the defendant's specific intent was an element of the crimes with which he was charged. The present case is indistinguishable from *DeJesus*, *Austin* and *Prioleau* on this ground.

The former ground on which *DeBarros* departed from *Austin* and *Prioleau* is inherently problematic. As we noted previously in this opinion, a challenged jury charge is to be "read as a whole . . . and judged by its total effect rather than by its individual component parts." (Internal quotation marks omitted.) *State* v. *DeJesus*, supra, 260 Conn. 473; see also *State* v. *Prioleau*, supra, 235 Conn. 284 ("individual instructions are not to be judged in artificial isolation from the overall charge" [internal quotation marks omitted]). A quantitative "litmus test" measuring how frequently a trial court gives an irrelevant instruction is therefore insufficient to establish an instruction's tendency to mislead the jury. The tendency of an irrelevant instruction to mislead the jury instead must be considered in the context of the whole charge.

Although the trial court in the present case gave the general intent instruction or referred to the principle of general intent a total of eleven times, the trial court also frequently instructed the jury that the defendant's specific intent was an element of the crimes with which the defendant was charged. Indeed, the trial court did so with such repetition, unequivocation and crystalline clarity that "[i]t strains reason to believe that the jury could have [interpreted] the challenged instruction as not requiring that the state prove beyond a reasonable doubt that the defendant [possessed the relevant specific intent]." (Internal quotation marks omitted.) *State*

v. *Prioleau*, supra, 235 Conn. 322. We therefore cannot conclude that there was a reasonable possibility that the trial court's instruction regarding general intent misled the jury or otherwise did an injustice to the defendant.

## II

The defendant next claims that the trial court improperly instructed the jury regarding the "combat by agreement" exception to self-defense because such an instruction was unwarranted in light of the evidence presented.[12] The state argues that the evidence was sufficient to support a "combat by agreement" jury instruction. We agree with the state.

General Statutes § 53a-19 (c), which embraces the "combat by agreement" exception to self-defense, provides in relevant part that "a person is not justified in using physical force when . . . (3) the physical force involved was the product of a combat by agreement not specifically authorized by law." A jury instruction regarding the "combat by agreement" exception to self-defense is warranted when the evidence is "sufficient to support a reasonable inference" that such a mutual combat occurred. *State* v. *Silveira*, 198 Conn. 454, 471, 503 A.2d 599 (1986). A "combat by agreement" instruction may be given in the absence of direct evidence of an agreement to engage in mutual combat, and, accordingly, "[t]he agreement required by [the 'combat by agreement' exception] need not be formal or express." Id.

Although the present case lacks direct evidence of an agreement to fight, the jury nonetheless could have inferred an implicit agreement to fight from the evidence. After Ramos urged David Arce to fight with the

---

[12] Unlike his first claim, the defendant preserved this claim at trial by requesting a jury instruction regarding his claim of self-defense.

defendant, David Arce returned with Angel Arce, who offered to fight Ramos "man-to-man . . . ." This evidence is itself sufficient to warrant a "combat by agreement" instruction. See *State* v. *Silveira*, supra, 198 Conn. 471 (upholding "combat by agreement" instruction when group confronted individual, individual left to gather friends, returned to confront group and brawl ensued). Alternatively, the jury simply could have disbelieved the testimony of those witnesses who claimed that Ramos or Angel Arce or both disclaimed an interest in fighting as they descended the driveway of 37-39 School Street. See id. (upholding "combat by agreement" instruction even though participants in brawl denied having agreement to fight); see also *State* v. *Meehan*, 260 Conn. 372, 381, 796 A.2d 1191 (2002) ("it is within the province of the jury to believe all or only part of a witness' testimony" [internal quotation marks omitted]). Because the evidence was sufficient to support a reasonable inference that the participants implicitly agreed to a mutual combat, the trial court properly instructed the jury regarding the "combat by agreement" exception to self-defense.

## III

The defendant finally claims that the trial court improperly failed to instruct the jury that, in an accessorial liability situation, self-defense[13] properly may be considered from the perspective of the principal actor. The defendant argues that, when "[a] defendant is charged as an accessory and it is [a] principal offender

[13] General Statutes § 53a-19 (a), Connecticut's self-defense statute, provides in relevant part: "[A] person is justified in using reasonable physical force upon another person to defend himself or a third person from what he reasonably believes to be the use or imminent use of physical force, and he may use such degree of force which he reasonably believes to be necessary for such purpose; except that deadly physical force may not be used unless the actor reasonably believes that such other person is (1) using or about to use deadly physical force, or (2) inflicting or about to inflict great bodily harm."

who shoots and kills (or assaults) the victims, the defenses of self-defense and defense of another must be considered from the perspective of the principal. Logically, that is the only scenario that makes sense." The state responds by arguing that the defendant's contention "is in conflict with the plain language of the self-defense statute and the law on accessorial liability . . . ." Although our analysis differs somewhat from that of the defendant, we nonetheless agree that a new trial is warranted.

The defendant failed to preserve this claim at trial[14] and now seeks to prevail under *Golding*. See part I of this opinion. The state does not dispute that the first two prongs of *Golding* have been satisfied with respect to this claim. The record is adequate for review, and it is well established that "[a]n improper instruction on a defense, like an improper instruction on an element of an offense, is of constitutional dimension." *State* v. *Ash*, 231 Conn. 484, 493, 651 A.2d 247 (1994); see also *State* v. *Fuller*, 199 Conn. 273, 278, 506 A.2d 556 (1986) ("A fundamental element of due process is the right of a defendant charged with a crime to establish a defense. . . . Whe[n] the legislature has created a legally recognized defense . . . this fundamental constitutional right includes a proper jury instruction on the elements of the defense . . . so that the jury may ascertain whether the state has met its burden of disproving it beyond a reasonable doubt." [Citations omitted; internal quotation marks omitted.]). Therefore, we address the merits of the defendant's claim under the third and fourth prongs of *Golding*.

---

[14] While the defendant requested a jury instruction regarding his own claim of self-defense, he neither requested a jury instruction regarding Ramos' use of self-defense nor took exception to the trial court's failure to instruct the jury regarding Ramos' use of self-defense.

## A

We preliminarily must determine whether the defendant established a sufficient evidentiary foundation to support his sought after instruction regarding Ramos' use of self-defense. "Before the jury is given an instruction on self-defense . . . there must be some evidentiary foundation for it. A jury instruction on self-defense is not available to a defendant merely for the asking. The defendant [is] only . . . entitled to a jury instruction on his theory of self-defense if he . . . present[s] applicable evidence no matter how weak or incredible . . . . However low the evidentiary standard may be, it is nonetheless a threshold the defendant must cross. The defendant may not ask the court to boost him over the sill upon speculation and conjecture." (Internal quotation marks omitted.) *State* v. *Wright*, 77 Conn. App. 80, 89, 822 A.2d 940, cert. denied, 266 Conn. 913, 833 A.2d 466 (2003).

In the present case, the defendant presented evidence sufficient to entitle him to an instruction regarding Ramos' use of self-defense. The state's witnesses testified that Ramos was new to the School Street neighborhood and did not know any of the members of the group that accompanied the Arces to 37-39 School Street. The state's witnesses also testified that Ramos was outnumbered eight to two as he backed down the driveway and eight to one after the defendant ducked into the back stairwell of the apartment house. The state's witnesses further testified that Ramos could not have known whether any members of the Arces' group facing him, other than Angel Arce,[15] were armed, and that Ramos could not have known whether the group would have permitted him to flee without resistance. Finally,

---

[15] As we noted previously, the evidence adduced at trial established that Angel Arce was shirtless and walking toward Ramos and the defendant with his hands extended away from his body.

the state's witnesses testified that the Arces and their group marched toward Ramos down the driveway of 37-39 School Street even as Ramos was pointing a pistol at them.

This evidence was sufficient to entitle the defendant to an instruction regarding Ramos' use of self-defense. Cf. *State* v. *Belle*, 215 Conn. 257, 275, 576 A.2d 139 (1990) (rejecting request for jury instruction on theory of defense when "no testimony was presented from which the jury could have [reached a conclusion on that theory] . . . without resorting to speculation"). We accordingly proceed to consider the substance of the defendant's claim, that is, whether such an instruction was warranted as a matter of law.

B

This court never has answered the question of whether a principal's use of self-defense properly may be considered in the prosecution of his accessory.[16] The answer to this question lies at the intersection of two complex doctrines, justification defenses and accessorial liability. We begin with a discussion of the general principles of justification, continue with a discussion of accessorial liability and conclude with a discussion of the ways in which the interplay of these two doctrines affects the present case.

---

[16] In *State* v. *Wright*, supra, 77 Conn. App. 80, the defendant, Ian Wright, who had been charged and convicted of murder as an accessory, claimed on appeal that he was "entitled to an instruction that the jury must acquit him if the principal's use of force was justified . . . ." Id., 85. The state responded that the language of General Statutes § 53a-9 precluded such an instruction. Id., 87 n.3.

The Appellate Court, however, found that the evidence presented at trial was insufficient to warrant an instruction on self-defense and explicitly "[left] to another day [the question of] whether the provisions of § 53a-9 would prevent the court from correctly giving a justification charge when a defendant is charged as an accessory to one whose behavior would entitle the actor to a justification charge pursuant to § 53a-19." Id.

1

## Justification Defenses

A justification defense represents a legal acknowledgment that the harm caused by otherwise criminal conduct is, under special justifying circumstances, "outweighed by the need to avoid an even greater harm or to further a greater societal interest."[17] 1 P. Robinson, Criminal Law Defenses (1984) § 24 (a), p. 83. For example, in the case of self-defense, "[s]ociety's interest in the right to bodily integrity, when combined with the physical harm threatened [by an aggressor], outweighs the normal prohibition against the physical injury needed to deter such an aggressor." Id., p. 84. All justification defenses share a similar internal structure: special "triggering circumstances permit a necessary and proportional response . . . ." Id., § 24 (b), p. 86. In Connecticut, self-defense is a justification for engaging in otherwise criminal conduct. See General Statutes § 53a-19; see also P. Robinson, "Criminal Law Defenses: A Systematic Analysis," 82 Colum. L. Rev. 199, 236 (1982) ("[i]n most modern codifications, self-defense is appropriately treated . . . as a pure justification").

Justified conduct is subject to neither condemnation nor punishment because it does not, "under the circumstances, violate the prohibition of the law, and indeed may be desired and encouraged." P. Robinson, supra, 82 Colum. L. Rev. 245. Thus, conduct that is found to

---

[17] In contrast to justification defenses, excuse defenses "concede that the act is wrongful, but seek to avoid the attribution of the act to the actor"; G. Fletcher, Rethinking Criminal Law (1978) p. 759; based "on the presence within the actor of a condition or status that exculpates him or her from culpability . . . ." *Taylor* v. *Commonwealth*, 31 Va. App. 54, 63, 521 S.E.2d 293 (1999), aff'd, 260 Va. 683, 537 S.E.2d 592 (2000). "A justification speaks to the rightness of the act; an excuse, to whether the actor is accountable for a concededly wrongful act." G. Fletcher, supra, p. 759. Examples of excuse defenses include insanity, duress and involuntary intoxication. G. Fletcher, "The Right and the Reasonable," 98 Harv. L. Rev. 949, 954–55 (1985).

be justified is, under the circumstances, not criminal. See *State* v. *Yanz*, 74 Conn. 177, 186, 50 A. 37 (1901) (*Hamersley, J.*, dissenting) ("killing in self-defense is not a crime"); *State* v. *Scheele*, 57 Conn. 307, 314, 18 A. 256 (1889) ("reasonable exercise of the right [of self-defense is] justifiable and not a crime at all"); *Morris* v. *Platt*, 32 Conn. 75, 83 (1864) ("no man is liable in a civil suit or criminal prosecution for an injury lawfully committed in self-defense upon an actual assailant"); see also *Thomas* v. *Leeke*, 725 F.2d 246, 249–50 n.2 (4th Cir.) ("Rooted in the Anglo-American tradition is the belief that a killing in self-defense is not a crime. . . . [I]t is elementary and fundamental to our jurisprudence that killing or wounding in self-defense is simply no crime at all . . . ." [Citations omitted.]), cert. denied, 469 U.S. 870, 105 S. Ct. 218, 83 L. Ed. 2d 148 (1984); Conn. Gen. Stat. Ann. § 53a-16 (West 2001), comment of the commission to revise the criminal statutes (self-defense statute "state[s] [a rule] of law under which the use of force is justified and thus not criminal").

2

Accessorial Liability

The United States Supreme Court has extensively and aptly chronicled the development of the law of accessorial liability. "At common law, the subject of principals and accessories was riddled with 'intricate' distinctions. 2 J. Stephen, A History of the Criminal Law of England [(1883) p. 231]. In felony cases, parties to a crime were divided into four distinct categories: (1) principals in the first degree who actually perpetrated the offense; (2) principals in the second degree who were actually or constructively present at the scene of the crime and aided or abetted its commission; (3) accessories before the fact who aided or abetted the crime, but were not present at its commission; and (4) accessories after the fact who rendered assistance after

the crime was complete. See W. LaFave & A. Scott, Criminal Law [(1972) § 63, pp. 495–96; R. Perkins, 'Parties to Crime,' 89 U. Pa. L. Rev. 581, 581–82 (1941)]. By contrast, misdemeanor cases '[did] not admit of [accessories] either before or after the fact,' *United States* v. *Hartwell*, 26 F. Cas. 196, 199 [(C.C. Mass. 1869) (No. 15,318)]; instead, all parties to a misdemeanor, whatever their roles, were principals. *United States* v. *Dotterweich*, 320 U.S. 277, 281 [64 S. Ct. 134, 88 L. Ed. 48] (1943); 1 C. Torcia, Wharton's Criminal Law [(14th Ed. 1978) § 33, pp. 169–70].

"Because at early common law all parties to a felony received the death penalty, certain procedural rules developed tending to shield accessories from punishment. See [W. LaFave & A. Scott, supra, § 63, p. 499]. Among them was one of special relevance . . . [namely] the rule that an accessory could not be convicted without the prior conviction of the principal offender. See 1 M. Hale, Pleas of the Crown [(1678) pp. 623–24]. Under this rule, the principal's flight, death, or acquittal barred prosecution of the accessory. And if the principal were pardoned or his conviction reversed on appeal, the accessory's conviction could not stand. In every way, 'an accessory [followed], like a shadow, his principal.' 1 J. Bishop, Criminal Law [(8th Ed. 1892) § 666].

"This procedural bar applied only to the prosecution of accessories in felony cases. In misdemeanor cases, [in which] all participants were deemed principals, a prior acquittal of the actual perpetrator did not prevent the subsequent conviction of a person who rendered assistance. [E.g., *Queen* v. *Humphreys & Turner*, 3 All E.R. 689, 692 (1965)] . . . . And in felony cases a principal in the second degree could be convicted notwithstanding the prior acquittal of the first-degree principal. [*Brown* v. *State*, 28 Ga. 199, 217 (1859); *State* v. *Whitt*, 113 N.C. 716, 719, 18 S.E. 715 (1893); *King* v. *Taylor &*

*Shaw*, 168 Eng. Rep. 283 (1785); *Queen* v. *Wallis*, 91 Eng. Rep. 294, 294–95 (K.B. 1703)]. Not surprisingly, considerable effort was expended in defining the categories—in determining, for instance, when a person was 'constructively present' so as to be a second-degree principal. . . . In the process, justice all too frequently was defeated.

"To overcome these judge-made rules, statutes were enacted in England and in the United States. In 1848 the Parliament enacted a statute providing that an accessory before the fact could be 'indicted, tried, convicted, and punished in all respects *like the Principal.*' . . . As interpreted, the statute permitted an accessory to be convicted 'although the principal be acquitted.' [*Queen* v. *Hughes*, 169 Eng. Rep. 1245, 1248 (1860)]. Several state legislatures followed suit." (Citations omitted; emphasis in original.) *Standefer* v. *United States*, 447 U.S. 10, 15–16, 100 S. Ct. 1999, 64 L. Ed. 2d 689 (1980).

Connecticut's abolition of the distinction between accessories and principals predated Parliament's by at least twenty-seven years. General Statutes (1821 Rev.) tit. 22, § 90[18] "abandon[ed] completely the old common law terminology" and "adopted the rule that there is no practical significance in being labeled an 'accessory' or a 'principal' for the purpose of determining criminal responsibility." *State* v. *Harris*, 198 Conn. 158, 164, 502 A.2d 880 (1985); see *State* v. *Hamlin*, 47 Conn. 95, 118–19 (1879). This rule continues in force today. Under the modern accessory statute, "[t]here is no such crime as *being an accessory* . . . . The accessory statute merely provides alternate means by which a substantive

---

[18] General Statutes (1821 Rev.) tit. 22, § 90, provides in relevant part: "[E]very person who shall aid, assist, abet, counsel, hire, or command any person or persons, to commit any crime or offence . . . shall suffer the same punishment as that to which the principal offender is subject."

crime may be committed." (Emphasis added; internal quotation marks omitted.) *State* v. *Harris*, supra, 163.

The current accessory statute, General Statutes § 53a-8 (a), provides that "[a] person, acting with the mental state required for commission of an offense, who . . . intentionally aids another person to engage in *conduct which constitutes an offense* shall be criminally liable for such conduct and may be prosecuted and punished as if he were the principal offender." (Emphasis added.) As this language indicates, another person's commission of an offense is a condition precedent to the imposition of accessorial liability.[19] E.g., *State* v. *Paredes*, 35 Conn. App. 360, 371 n.10, 646 A.2d 234 ("proof of the commission of the crime is a condition precedent to conviction as an accessory"), cert. denied, 231 Conn. 925, 648 A.2d 166 (1994); *State* v. *Quint*, 18 Conn. App. 730, 733, 560 A.2d 479 (1989) ("the state was required to prove the substantive offense in order to establish accessorial liability").

In *State* v. *Hope*, 203 Conn. 420, 422–23, 524 A.2d 1148 (1987), the defendant, James Y. Hope, was charged with, inter alia, capital felony on the theory that he had aided and abetted John J. McGann's murder of Donald C. Burke for pecuniary gain. See id., 422–23. Hope and McGann were tried separately. See id., 423–24. The trial court dismissed the charge against Hope, and the state appealed to this court. Id., 422.

During the pendency of the state's appeal, we decided in McGann's parallel appeal that, due to the absence of a hiring relationship between McGann and his alleged

---

[19] The trial court in the present case accordingly instructed the jury that an element of each of the two counts of manslaughter as an accessory with which the defendant was charged was that "Ramos, acting with that common criminal intent, intent to cause serious physical injury to another person, caused the death of . . . [the victim] by fatally shooting [him] with a firearm."

hirer,[20] "the circumstances of [McGann's] involvement in the murder of . . . Burke [did] not bring him within the category of hired assassin that the legislature sought to punish for the offense of capital felony . . . ." (Internal quotation marks omitted.) Id., 423. We consequently dismissed Hope's appeal as moot; id., 425; reasoning that Hope could not "be held liable as an accessory [to capital felony] in the absence of evidence that anyone else committed a capital felony . . . ."[21] Id., 424.

The proposition that another person's commission of an offense is a condition precedent to the imposition

[20] Burke's wife sought to have Burke murdered and called on McGann to find someone to commit the murder. *State* v. *McGann*, 199 Conn. 163, 170–71, 506 A.2d 109 (1986). After McGann reported to Burke's wife that he had found a person named George Rooney who agreed to murder Burke for $4000, Burke's wife gave McGann $3500 with the understanding that McGann would cover the remaining balance of $500. Id., 171. Unbeknownst to Burke's wife, Rooney previously had agreed with McGann to commit the murder for $3000. Id. McGann therefore paid Rooney $3000 and retained the remaining $500. Id. After Rooney declined to commit the murder and to return the $3000 that McGann had given him, McGann killed Burke with Hope's assistance. Id., 172–73. In concluding that a hiring relationship did not exist between McGann and Burke's wife, the court reasoned that Burke's wife was unaware that McGann had retained the $500 and "must have assumed that [McGann] was carrying out the murder because of his friendship with her and his embarrassment over the financial loss she had sustained as a result of his recommendation of Rooney. The circumstances known to her concerning [McGann's] motivation and relationship to the murder would not have led a reasonable person in her situation to believe that she had hired [McGann] to commit the murder . . . ." Id., 176.

[21] *Hope* since has been interpreted to stand "for the more limited principle that if, as a matter of law, the evidence was legally insufficient to show that any capital felony had occurred, the accessory could not be charged with it." *State* v. *Garner*, 270 Conn. 458, 480, 853 A.2d 478 (2004). Conversely, the prosecution of an accused accessory may proceed when the evidence is *factually* insufficient to establish who committed the crime, but the accessory makes "no claim that [the crime] was not committed . . . ." Id., 481; see *State* v. *Solek*, 242 Conn. 409, 427, 699 A.2d 931 (1997) (state's lack of probable cause to charge accused principal with crime does not mean that, "as a matter of law, [the accused principal] did not commit the offense" and, therefore, does not preclude prosecution of accused accessory).

The subsequent limitation of *Hope*, however, has no effect on the present case because the defendant's successful showing of Ramos' use of self-

of accessorial liability is consistent with federal law. See, e.g., *United States* v. *Ruffin*, 613 F.2d 408, 412 (2d Cir. 1979) ("a defendant charged with aiding and abetting the commission of a crime by another cannot be convicted in the absence of proof that the crime was actually committed"); *United States* v. *Cades*, 495 F.2d 1166, 1167 (3d Cir. 1974) ("[i]n order to convict a defendant of aiding and abetting the commission of a crime, it is first essential that the [g]overnment demonstrate that the substantive crime has been committed"); *Meredith* v. *United States*, 238 F.2d 535, 542 (4th Cir. 1956) (proof that "the act constituting the offense was in fact committed by someone" is prerequisite to aiding and abetting conviction); *Manning* v. *Biddle*, 14 F.2d 518, 519 (8th Cir. 1926) ("it is an essential thing [to an aiding and abetting conviction] that a crime was actually committed"). Like Connecticut law, federal law does not distinguish between principals and accessories. See, e.g., *Standefer* v. *United States*, supra, 447 U.S. 19.

The proposition that another person's commission of an offense is a condition precedent to the imposition of accessorial liability also is consistent with General Statutes § 53a-9. That statute provides in relevant part that, "[i]n any prosecution for an offense in which the criminal liability of the defendant is based upon the conduct of another person under section 53a-8 it shall not be a defense that: (1) Such other person is not guilty of the offense in question because of lack of criminal responsibility or legal capacity or awareness of the criminal nature of the conduct in question or of the defendant's criminal purpose or because of other factors precluding the mental state required for the commission of the offense in question . . . ." General Statutes § 53a-9 (1).

---

defense would establish, as a matter of law, that no criminal acts occurred. See part III B 1 of this opinion.

The purpose of § 53a-9 was clearly articulated in *State* v. *McCarthy*, 179 Conn. 1, 425 A.2d 924 (1979). In that case, the defendant, Robert J. McCarthy, enlisted Jean Siretz to murder a man whom McCarthy suspected of vandalizing his automobile. Id., 3. McCarthy provided Siretz with a loaded gun, instructed her regarding how to shoot the intended victim and where to hide the gun, and drove her to the home of the intended victim. Id., 4. McCarthy then went to the emergency room of a local hospital, apparently attempting to establish an alibi. See id. Siretz shot both the intended victim and the intended victim's wife, killing only the wife. Id. The trial testimony indicated that Siretz may have been intoxicated by cocaine or LSD or both at the time of the murder; id., 3; but McCarthy nonetheless was prosecuted and convicted of murder as an accessory. Id., 2.

On appeal to this court, McCarthy claimed that the trial court improperly had instructed the jury to disregard Siretz' intent in shooting the two victims. Id., 12. We rejected McCarthy's contention, determining that "§ 53a-9 governed the situation." Id., 15. We explained that "[t]he purpose behind § 53a-9 is to prevent the specific type of evil presented by this precise fact[ual] situation: A Mansonesque figure using a mentally incompetent individual to commit a crime and going free because the actual perpetrator is incapable of the requisite intent. A crime may be performed though the actual perpetrator lacked the requisite mental capacity." Id., 16. The clear implication of the latter statement is that the commission of a crime is a condition precedent to the imposition of accessorial liability. Section 53a-9, as it has been interpreted by *McCarthy,* therefore supports our conclusion that another person's commission of an offense is a condition precedent to the imposition of accessorial liability.[22]

---

[22] The state also argues that this conclusion is belied by § 2.06 (7) of the Model Penal Code, which provides that an accomplice may be convicted "though the person claimed to have committed the offense has not been

### 3

## Interplay of Justification Defenses
## and Accessorial Liability

Having established that justified conduct is not criminal and that the commission of a crime is a condition precedent to the imposition of accessorial liability for that crime, we now turn to the facts of the present case.

The defendant alleges that the principal actor, that is, Ramos, shot the victims in self-defense and that the trial court therefore should have instructed the jury regarding Ramos' use of self-defense. If Ramos shot the victims in self-defense, then his conduct was justified and no criminal acts occurred for which the defendant could be held liable as an accessory. See, e.g., *United States* v. *Lopez*, 662 F. Sup. 1083, 1087 (N.D. Cal. 1987) ("[a] justified action is not wrongful; therefore, the prerequisite to imposing liability on [an accused accessory] as an aider and abettor will not be satisfied"), aff'd, 885 F.2d 1428 (9th Cir. 1989), cert. denied, 493 U.S. 1032, 110 S. Ct. 748, 107 L. Ed. 2d 765 (1990). This circumstance would doom the accessory charges against the defendant because "[a] third party has the right to assist an actor in a justified act."[23] Id., 1086; see also G.

prosecuted or convicted or has been convicted of a different offense or degree of offense . . . ." The Model Penal Code, however, is not the law of this state. In fact, we have not adopted that portion of the Model Penal Code. See *State* v. *Floyd*, 253 Conn. 700, 722, 756 A.2d 799 (2000).

Moreover, the state's argument confuses the issue of who commits a crime with the issue of whether a crime was committed. Even under the Model Penal Code, the latter issue must be resolved affirmatively to permit the conviction of an accessory. As the official commentary to the Model Penal Code provides, § 2.06 (7) "does not, of course, dispense with the necessity of proving the commission of the crime as an element of liability of the accomplice." 1 American Law Institute, Model Penal Code and Commentaries (1985) § 2.06, p. 327. The state is simply incorrect in arguing that § 2.06 (7) contradicts our conclusion.

[23] The fact that a person cannot be convicted as an accessory to justified conduct, however, does not preclude the conviction of that person, solely on the basis of his own culpability, of a substantive or inchoate offense arising out of the same incident. See, e.g., P. Robinson, supra, 82 Colum.

Fletcher, Rethinking Criminal Law (1978) § 10.1.1, pp. 761–62 ("That the doing is objectively right (or at least not wrongful) means that anyone is licensed to do it. The only requirement is that the act be performed for the justificatory purpose . . . ."); K. Greenawalt, "The Perplexing Borders of Justification and Excuse," 84 Colum. L. Rev. 1897, 1900 (1984) ("[j]ustified action . . . may be assisted by those in a position to render aid"); P. Robinson, supra, 82 Colum. L. Rev. 279 ("[a]ssisting . . . another to engage in justified conduct should be similarly justified"). A jury instruction regarding Ramos' use of self-defense in shooting the victims therefore was warranted.[24]

Very few modern authorities have encountered a comparable situation. Neither the state nor our own independent research has identified a single jurisdiction that has declined to consider the principal's use of self-defense in such a situation. Two decisions addressing comparable situations, however, have reached conclusions that are consistent with the conclusion that we reach in the present case.

In *United States* v. *Lopez*, supra, 662 F. Sup. 1084, the defendant Ronald McIntosh escaped from federal

---

L. Rev. 279–80 ("the confederate of a justified perpetrator may . . . be liable for an attempt" in such circumstances).

[24] This is not to conclude, however, that self-defense cannot also be viewed from the perspective of an accused accessory. Section 53a-8 requires an accused accessory to have "both the intent to help the principal and the intent to commit the crime." *State* v. *Vincent*, 194 Conn. 198, 207, 479 A.2d 237 (1984). "The mental state required by § 53a-8 exempts from liability those whose innocent acts in fact aid one who commits a crime." *State* v. *McCalpine*, 190 Conn. 822, 832, 463 A.2d 545 (1983).

Even if a principal does not act in self-defense, an accused accessory still may defend against an accessory charge by demonstrating that his act of soliciting, requesting, commanding, importuning or intentionally aiding the principal itself was committed in self-defense as defined by § 53a-19. See, e.g., *United States* v. *Lopez*, supra, 662 F. Sup. 1087 (permitting accused accessory to "raise his own, independent necessity defense" in addition to the " 'derivative' necessity defense . . . which depends entirely on whether [the accused principal's] necessity defense prevails").

custody and, one week later, flew a helicopter into the recreation yard of his former prison and absconded with another inmate, the defendant Samantha D. Lopez. Following their apprehension, Lopez was charged with escaping from federal custody, and McIntosh was charged with, inter alia, aiding and abetting her escape. Id. Both McIntosh and Lopez asserted a defense of "necessity/duress," which the court interpreted as a necessity defense.[25] Id., 1086. The government, however, filed a motion seeking to preclude McIntosh and Lopez from presenting evidence to the jury regarding their necessity defense. Id., 1085.

In denying the government's motion, the court concluded that, "if the jury finds Lopez not guilty of escape by reason of her necessity defense, her criminal act will be justified," and McIntosh therefore could not be guilty of aiding and abetting her escape. Id., 1087. The court accordingly concluded that McIntosh was entitled to an instruction that, "[i]f [the jury] find[s] . . . Lopez not guilty of escape because she acted under necessity/duress, then [the jury] must also find . . . McIntosh not guilty of aiding and abetting her alleged escape." (Internal quotation marks omitted.) Id., 1085.

In *State* v. *Winsett*, 58 Del. 111, 205 A.2d 510 (Super. 1964), the defendant Thomas H. Winsett was charged with the murder of Robert A. Paris, a Delaware state trooper. Id., 117, 135. The defendants Wilbert A. Weekley and Edward J. Mayerhofer, who were helping Winsett steal televisions from a motel at the time of the killing, were charged with aiding and abetting Winsett's murder of Paris. Id. At the joint trial of the three codefendants, Winsett maintained that he shot Paris in self-defense, claiming that he did not realize that Paris was a peace officer when he shot him. See id., 123–24. The

---

[25] Necessity, like self-defense, is a justification defense. 2 W. LaFave, Substantive Criminal Law (2d Ed. 2003) § 10.1, p. 116.

trial court accordingly instructed the jury on the subject of Winsett's self-defense. Id., 123–26.

More significantly, however, the trial court in *Winsett* also instructed the jury regarding the effect that Winsett's claim of self-defense would have on the prosecutions of Weekley and Mayerhofer. Id., 128. The court instructed the jury in relevant part: "If you find that self-defense is available to the defendant Winsett, and if for that reason you determine that he is not guilty . . . [of murder], then you must also find the defendants Weekley and Mayerhofer not guilty [of aiding and abetting the murder] . . . . In short, [Weekley and Mayerhofer] cannot be held criminally responsible for aiding and abetting a homicide which is found to have been committed in self-defense." Id.

In the present case, the defendant was entitled to an instruction regarding Ramos' use of self-defense. The trial court improperly failed to give such an instruction. We therefore proceed to consider the fourth prong of *Golding*, namely, whether the trial court's error was sufficiently harmful to warrant a new trial.

C

"If an improper jury instruction is of constitutional magnitude, the burden is on the state to prove harmlessness beyond a reasonable doubt. . . . An alleged defect in a jury charge which raises a constitutional question is reversible error if it is reasonably possible that, considering the charge as a whole, the jury was misled." (Citation omitted; internal quotation marks omitted.) *State* v. *Padua*, 273 Conn. 138, 166, 869 A.2d 192 (2005); see also *State* v. *Woods*, 234 Conn. 301, 308, 662 A.2d 732 (1995) (when "alleged error [in a jury instruction] relates to the elements of the crime charged, reversal of the defendant's conviction and a new trial are mandated if, in the context of the charge

as a whole, it is reasonably possible that the jury was misled").

There can be no doubt that the impropriety in the trial court's jury instruction was of constitutional magnitude. The state has not briefed the issue of whether the trial court's failure to instruct the jury to consider self-defense from the perspective of the principal was harmless beyond a reasonable doubt. Consequently, the state has failed to demonstrate the harmlessness of the trial court's error. Moreover, it is at least reasonably possible that the trial court's charge misled the jury by precluding it from finding that the defendant was charged with accessorial liability for a noncriminal act.[26]

The judgment is reversed and the case is remanded for a new trial.

In this opinion the other justices concurred.

---

[26] Although the defendant was found guilty of assault in the first degree as a principal *or* accessory, he is entitled to a reversal of his conviction on that charge in addition to his conviction on the manslaughter charges. Because one of the state's theories was that the defendant could have been guilty of assault in the first degree as an accessory, the defendant was entitled to an instruction regarding Ramos' use of self-defense in the context of the assault. Furthermore, it cannot be determined from the record whether the jury based its verdict with respect to the assault charge on a theory of principal liability or accessorial liability.