******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# STATE OF CONNECTICUT *v.* MATTHEW ALLEN HALL-DAVIS
## (AC 39619)

Sheldon, Prescott and Bishop, Js.

*Syllabus*

Convicted of the crimes of murder, conspiracy to commit murder and criminal possession of a firearm in connection with the shooting death of the victim, the defendant appealed. The victim was the pregnant girlfriend of the defendant's friend, B, who told the defendant that he wanted him to kill the victim. The defendant claimed that, after he told B several times that he could not go through with the plan, B was angry and threatened him with a gun. Thereafter, the defendant allegedly changed the plan and decided to shoot B instead of the victim, but when he shot into a vehicle in which the victim and B were sitting, the bullet struck and killed the victim. On appeal, the defendant claimed, inter alia, that the trial court improperly failed to instruct the jury on defense of others, contending that he was entitled to such an instruction because the evidence demonstrated that he was trying to protect the victim from B. *Held*:

1. The trial court properly declined to instruct the jury on the defendant's theory of defense of others: when viewed in the light most favorable to the defendant, the evidence, including that B expressed his desire to have the victim killed, solicited the defendant to kill the victim, was angry that the defendant was hesitant to do so, threatened to kill the defendant and the victim if the defendant did not kill the victim, and may have had his own gun while he was parked in the car with the victim, may have been sufficient to show that the defendant subjectively believed that the victim was at imminent risk of having great bodily harm inflicted on her by B, but was insufficient to satisfy the defendant's slight burden of demonstrating that it would have been objectively reasonable for him to believe that, at the time he fired the gun, the victim was at imminent risk of having such harm inflicted on her by B, as the evidence demonstrated that the defendant engaged in a preemptive strike against B, which is not justified under a defense of others theory; moreover, the evidence was insufficient to establish that B fired a gun from within the car and thereby subjected the victim to imminent danger of great bodily harm, and, even if B did have a gun, there was no evidence to suggest that he was using or about to use deadly physical force or about to inflict great bodily harm on the victim.

2. The defendant could not prevail on his unpreserved claim that the trial court improperly restricted defense counsel from arguing defense of others and renunciation of criminal purpose during closing argument, and thereby violated the defendant's constitutional right to the effective assistance of counsel: although the record was adequate for review and the claim was of constitutional magnitude, the defendant failed to demonstrate that the alleged constitutional violation existed and deprived him of a fair trial, as defense counsel, who was precluded from discussing her legal theories of the case, was not precluded from arguing facts elicited at trial and made arguments that supported the defendant's theory of defense of others and highlighted the defendant's renunciation without specifically mentioning that word; moreover, the defendant was not entitled to relief under the plain error doctrine, he having failed to show that the court's restriction on defense counsel's closing argument was so obviously erroneous that it affected the fairness or integrity of or public confidence in the judicial proceedings.

3. The defendant's unpreserved claim that the trial court gave the jury a faulty and misleading instruction on conspiracy was unavailing, the defendant having waived his right to challenge that instruction on appeal because he had a meaningful opportunity to review it but failed to object.

Argued April 27—officially released October 17, 2017

*Procedural History*

Substitute information charging the defendant with the crimes of murder, conspiracy to commit murder and criminal possession of a firearm, brought to the Superior Court in the judicial district of Hartford and tried to the jury before *Bentivegna, J.*; verdict and judgment of guilty, from which the defendant appealed. *Affirmed.*

*Pamela S. Nagy*, assistant public defender, for the appellant (defendant).

*Nancy L. Chupak*, senior assistant state's attorney, with whom, on the brief, were *Gail P. Hardy*, state's attorney, and *Donna Mambrino*, senior assistant state's attorney, for the appellee (state).

*Opinion*

BISHOP, J. The defendant, Matthew Allen Hall-Davis, appeals from the judgment of conviction, rendered after a jury trial, of murder in violation of General Statutes § 53a-54a (a), conspiracy to commit murder in violation of General Statutes §§ 53a-48 (a) and 53a-54a (a), and criminal possession of a firearm in violation of General Statutes § 53a-217 (a) (1). On appeal, he argues that the trial court (1) erred by refusing to give the jury an instruction on defense of others, (2) improperly restricted his closing argument, and (3) gave the jury a faulty and misleading instruction on conspiracy. We affirm the judgment of the trial court.[1]

The jury reasonably could have found the following facts. The charges against the defendant stemmed from a shooting that occurred at approximately 1 a.m. on April 29, 2013, on Magnolia Street in Hartford in which the victim, Shamari Jenkins, was killed. The defendant and the victim's boyfriend,[2] Carlton Bryan, were "[b]est friends" and had known each other for about ten years. The defendant had been living with Bryan in April, 2013. The victim was nineteen weeks pregnant with Bryan's baby at the time of her death. Bryan then also had another girlfriend, who was described as his "preferred girlfriend," with whom he had a child. In January, 2013, Bryan asked the victim to have an abortion, to which she initially agreed. She later changed her mind, however, which upset Bryan because her pregnancy was interfering with his relationship with his other girlfriend. At the end of March, 2013, or in early April, 2013, Bryan mentioned to the defendant that he "wanted to do something about" the victim, but the defendant thought that Bryan was "just acting stupid."

On the morning of April 28, 2013,[3] the defendant and Bryan went to the victim's house, where she made breakfast and they stayed for a barbeque. The defendant and Bryan had been drinking alcohol all morning, and they continued to do so at the barbeque. At some point during the day, the defendant heard Bryan and the victim arguing. Bryan was acting "over the top" and "belligerent." The defendant and Bryan left and went to Bryan's house where they continued to drink alcohol. The victim later came to Bryan's house, and she and Bryan left in her car and parked outside of 149–151 Magnolia Street, near the intersection with Mather Street. The defendant also left the house and drove Bryan's car to Magnolia Street, where his cousin and brother lived, and happened upon Bryan and the victim. Here, the defendant pulled in front of the victim's car, and Bryan got in.

While the defendant and Bryan were sitting in Bryan's car, Bryan told the defendant that he had "had enough of [the victim]." Bryan looked at the defendant with a "dead stare" and pulled out a .44 caliber revolver. He

told the defendant that the victim "[had to] go before a certain month" and asked the defendant to "do this for" him. Bryan gave the defendant a ski mask, gloves, and the gun, and told him to park the car on Enfield Street, one block from Magnolia Street, put on the mask and gloves, and come through "the cut," a pedestrian passageway between Enfield Street and Magnolia Street, and "empty the revolver" in the driver's side door of the victim's car.

The defendant drove to Enfield Street, where he parked the car and "sat there for a minute" thinking of "ways . . . [to] brush [Bryan] off or get out of it." "[A]fter a while," he got out of the car and sat by a tree near the cut for about five minutes. Then he sat under a window thinking about ways to get out of killing the victim. He left the gun, mask, and gloves by the tree, and drove Bryan's car back to Magnolia Street, where he told Bryan that he saw someone outside and could not go through with the plan. After Bryan determined that there was no one else in the vicinity, the defendant drove back to Enfield Street and sat in the car, after which he returned to the tree to retrieve the gun, mask, and gloves, and "just sat there" until he decided to leave it all there again, got back into the car and drove back to Magnolia Street for a second time. The defendant told Bryan that he could not go through with the plan, but Bryan was "bugging" and "dead serious at that point."

The defendant then drove back to Enfield Street where he once again picked up the gun, mask, and gloves, but still could not go through with the plan. He drove back to Magnolia Street for a third time, where Bryan was "furious" with him. He and Bryan were in the car for roughly a minute and a half when Bryan pulled out of his pocket a nine millimeter gun and told the defendant, "[i]t's you or her," and then got out of the car and returned to the victim's car. The victim remained in her car on Magnolia Street during these encounters.

The defendant sat in Bryan's car "for a minute" on Magnolia Street and then decided that he would change the plan and shoot Bryan instead of the victim. He claimed that he then drove back to Enfield Street and "sat there again for a little bit" before returning to the tree to retrieve the gun, mask, and gloves. He then decided to change the plan further and, instead of going to Magnolia Street through the cut, he would go around the buildings and approach the victim's car from behind, thinking that Bryan would not expect that. The defendant stood behind a car that was parked on Magnolia Street and was "trying to get up the nerve" to shoot Bryan, and then "jumped up and . . . started . . . to jog around the car" when he heard Bryan yell to the victim, "[p]ull off. Pull off. Pull off." At the same time that Bryan leaned over to grab the steering wheel, the

defendant shot the gun into the passenger side of the back window as the car was pulling away from the curb. The bullet went through the passenger side of the rear window of the car, through the right side of the driver's seat, into the back of the victim's right shoulder and lodged in her heart. As this occurred, the car accelerated through the intersection of Magnolia Street and Mather Street, crashing into stairs in front of 137 Magnolia Street. The defendant fled back to Enfield Street and drove off in Bryan's car. Emergency services personnel arrived, and the victim was taken to a hospital where she was pronounced dead.

Bryan initially told Hartford police on the scene that an unidentified person had shot into the car as the victim was driving away. Later at the hospital, Bryan told Hartford police Detective Reginald Early that an unidentified person had come up to the car and attempted to rob them, and shot once into the car while the victim was trying to drive away. He later changed his story again and identified the person who attempted to rob them as a man with a "street name" of "Low," someone he knew from prison. Early thereafter investigated "Low" and determined that he had an alibi for the time of the shooting.

On April 29, 2013, the defendant went to the Hartford police station to speak with Early about the victim's death because Bryan had told the defendant that Early wanted to speak with him, which was untrue. The defendant told Early that Bryan had relayed to him that the victim was shot during an attempted robbery, but that Bryan could not identify the shooter. The defendant was not a suspect at that point.

On May 23, 2013, the defendant was arrested in connection with a robbery that took place at J B Expo in Manchester on May 11, 2013, after Early called the Manchester police and identified the defendant as the person with a gun in surveillance footage.[4] On May 25, 2013, the defendant's friend, Kingsley Minto, was also arrested for the robbery and told Manchester police in confessing to his involvement that the defendant had hidden the gun used in the robbery in Henry Park in Vernon, wrapped in a white shopping bag. Minto also testified that the defendant threw a shell casing out of the car window on the way from the robbery and said it was the shell casing from the victim's shooting. Subsequently, Manchester police recovered the gun, a Ruger .44 caliber revolver, in Henry Park.

On May 29, 2013, Early and another Hartford police detective interviewed the defendant at the Hartford Correctional Center, where he confessed to killing the victim, at Bryan's request, with the gun that was found in Henry Park. The defendant told Early that Bryan felt like the victim was "ruining his life" by having their baby and had asked the defendant to kill her for him. The defendant told Early that he could not go through

with the plan and intended to shoot Bryan instead of the victim. The defendant was charged with the victim's murder.

By information dated January 8, 2015, the state charged the defendant with murder in violation of § 53a-54a (a),[5] conspiracy to commit murder in violation of §§ 53a-48 (a)[6] and 53a-54 (a), and criminal possession of a firearm in violation of § 53a-217 (a) (1).[7] The five day evidentiary portion of the jury trial, at which the defendant testified, took place between January 30 and February 9, 2015. On February 10, 2015, the court, *Bentivegna*, *J.*, held a charge conference with counsel to discuss proposed jury instructions. At the conference, the defendant asked that the jury be instructed on defense of others and renunciation of criminal purpose, a request that the court denied.[8] On February 11, 2015, the jury returned a guilty verdict on all three counts.[9]

The defendant was sentenced on May 1, 2015, to fifty years incarceration on the charge of murder; twenty years incarceration on the charge of conspiracy to commit murder, to run consecutively to the first sentence; and five years incarceration on the charge of criminal possession of a firearm, to run concurrently with the first two sentences, for a total effective sentence of seventy years incarceration. This appeal followed. Additional facts will be set forth as necessary.

I

The defendant claims first that the court erred in refusing to give the jury an instruction on defense of others. Specifically, he asserts that he provided ample evidence at trial that he was trying to protect the victim from Bryan, and, therefore, his due process right to present a defense was violated by the court's refusal to instruct the jury on defense of others.[10] We are not persuaded.

The following additional facts are relevant to our resolution of this claim. The defendant testified that when Bryan asked him, on April 28, 2013, to kill the victim, he thought Bryan was "tripping" and that he was just "drunk [and] high," but also that Bryan seemed "clearheaded" and was "describing things like he knew what he wanted." He testified that Bryan was "mad" and that he had "never seen that side of" Bryan before. When he told Bryan that he could not go through with the plan, Bryan was "bugging" and "dead serious . . . ." The defendant testified that after Bryan took out the nine millimeter gun and threatened him, "[a]t that point, I pretty much knew, either—I'm not going to say he was going to do something, but something was going to happen. . . . I pretty much knew he was set on killing [the victim]." He further testified that at that point he "just knew . . . he was going to kill me or [the victim] or, if not, both of us . . . . I knew too much. . . . I'm not going to say he was going to do it

himself, but he was either going to kill her or he was going to kill me."

The defendant testified that he "didn't see any options" because this was "a duel to the death with a gun in [his] face" and that he "wasn't thinking right." He further testified that Bryan "threatened [his] life," and he felt like he had "nowhere to go after that" because he lived with Bryan and Bryan knew all of his friends. The defendant said, "I just—my mind was just: shoot [Bryan]." When asked on direct examination why he did not go home or go to his girlfriend's house, the defendant testified that he "could've probably left," but then, Bryan "would've been looking for me after that. . . . I could only take him for what he said; he was going to kill me." He further testified, "if not [the victim], it was going to be me." Additionally, he testified that in the moment, he "didn't want nothing to happen to" the victim, but also that he was not trying "to protect her a hundred percent" because he "wanted to help her" but also "wanted to protect [himself]."

After the victim's funeral, the defendant asked Minto if he knew who shot the victim, to which Minto responded that he thought it was Bryan. The defendant then confessed to Minto and told him that it was Bryan's idea, but that he changed the plan, however, and accidentally shot the victim as he was trying to shoot Bryan. Minto testified that the defendant did not tell him that Bryan pulled out a gun, and that, as far as Minto knew, the defendant was the only person there with a gun that night. Minto testified further that he knew Bryan to be "almost perpetually" and "constantly" in possession of a firearm, but "[n]ot always."

Everett Walker, the defendant's "distant cousin," also testified that he had seen Bryan with the .44 caliber gun on previous occasions and that Bryan also "might've had something smaller . . . ." When police arrived on the scene on April 29, 2013, Bryan was patted down and there was no firearm recovered. Additionally, the defendant's written statement did not include any claim that Bryan had a gun that night or that Bryan threatened to kill him if he did not shoot the victim. The defendant testified that he did tell the police that Bryan threatened him with a gun that night.

Walker testified that he saw Bryan on Enfield Street on the night of April 28, 2013, and that Bryan was "mad about [the victim] being pregnant and he didn't want it . . . . [H]e [was] talking about [how] he wanted to kill her . . . ." He further testified that Bryan asked him to tell the police that he saw someone running away toward Enfield Street after the shooting. Walker testified that, while he was at his house on Magnolia Street, he heard "a few shots." He testified on direct examination that he heard "two shots," but testified on cross-examination that he believed it was one gunshot, although he was "not really sure," but thinks it was one

shot "because [he] only heard that one distinct sound, but like a deep boom" and that's "all [he] heard." He said that after he heard the shot or shots, he got low to the ground and then looked out of the window and saw Bryan steering the car, crash into steps down the street, and jump out. He did not see anyone running away from the scene and never told the police that he did.

In addition to Walker's testimony that he told the police that he heard two gunshots, the state presented evidence from Hartford police Detective Candace Hendrix, who testified about a "defect, some type of damage," on the passenger side of the victim's car. She testified that there was a hole in the A-pillar of the passenger side, which is the part of the car between the window and the windshield. Hendrix labeled the defect "BH-2," or "bullet hole 2," though she testified that she did not, in fact, know whether it was a bullet hole. She testified that there were no plastic fragments below the defect, and that she took off the dashboard but did not find a bullet or any fragments inside that would have indicated that it was caused by a bullet. She testified further that even if the defect was created by a bullet, it could not have been created by the fatal bullet that was fired by the defendant, and she could not say either when or how the defect was made.

At the charge conference, the defendant requested that the jury be instructed on defense of others. In support of this argument, defense counsel highlighted the following portions of the defendant's testimony: Bryan was "drunk, belligerent and over the top" on April 28, 2013, and had gotten into an argument with the victim earlier in the day; Bryan was in possession of a second, smaller gun other than the .44 caliber that he had given to the defendant; Bryan told the defendant that the victim was ruining his life; Bryan was acting that day in a manner that the defendant had never seen before; and Bryan was "bugging out and furious" when the defendant told him that he could not go through with killing the victim, pulling out the smaller gun and saying "it's either you or it's her . . . ." Defense counsel further highlighted, as support for a defense of others instruction, Minto's testimony that Bryan previously had discussed wanting to kill the victim and that when Minto heard that the victim was shot, he assumed that Bryan had shot her. Defense counsel also highlighted Walker's testimony that Bryan asked him to be a lookout and to tell the police that he saw someone running away from the car after he heard gunshots, and Minto's testimony that he had seen Bryan with a small gun on previous occasions. Defense counsel argued that on the basis of the testimony of the defendant, Minto, and Walker, there was sufficient evidence that "something was going to happen that night" and that it would happen imminently, which would "raise reasonable doubt in the mind of a rational juror . . . ." The state opposed

the defendant's request and argued that the evidence was "lacking in objective reasonability of imminent danger . . . ."

The court denied the defendant's request for three reasons. First, the court opined that "public policy principles weigh against giving [a defense of others] instruction in this particular case." Second, the court opined that there was "a lack of evidence to support the defendant's contention that at the time he fired the firearm, it was objectively reasonable for him to believe that it was necessary to do so in order to defend [the victim]." The court further highlighted the fact that the evidence reflected that Bryan's plan "was to make it appear that someone else had murdered [the victim], not that he had murdered" her, that there was no evidence of a nine millimeter handgun that Bryan allegedly had that night, and that "[t]he most that can be inferred is that [the victim] and the defendant might have been endangered at some point in the future . . . ."[11] The court opined that the only way the jury reasonably could find that Bryan was using or was about to use deadly force against the victim was by "resorting to impermissible speculation." Last, the court opined that this was a "classic example of preemptive strike," which defense of others does not encompass. In so finding, the court highlighted the lack of evidence that the victim was in imminent danger of deadly physical force by Bryan, the fact that the defendant went back and forth between Enfield Street and Magnolia Street multiple times before shooting, and the fact that the defendant approached the vehicle from behind. On the basis of those three reasons, the court denied the defendant's request to instruct the jury on defense of others.

We begin our analysis by setting forth our standard of review. "[T]he fair opportunity to establish a defense is a fundamental element of due process of law . . . . This fundamental constitutional right includes proper jury instructions on the elements of [defense of others] so that the jury may ascertain whether the state has met its burden of proving beyond a reasonable doubt that the [crime] was not justified. . . . Thus, [i]f the defendant asserts [defense of others] and the evidence indicates the availability of that defense, such a charge is obligatory and the defendant is entitled, as a matter of law, to [an] . . . instruction [on defense of others]." (Citations omitted; internal quotation marks omitted.) *State* v. *Bryan*, 307 Conn. 823, 832, 60 A.3d 246 (2013). "[I]n reviewing the trial court's rejection of the defendant's request for a jury charge on [defense of others], we . . . adopt the version of the facts most favorable to the defendant which the evidence would reasonably support." (Internal quotation marks omitted.) Id., 836; see also *State* v. *Lewis*, 220 Conn. 602, 619, 600 A.2d 1330 (1991).

We next look at the relevant legal principles sur-

rounding defense of others. General Statutes § 53a-19 (a) codifies defense of others and provides in relevant part: "[A] person is justified in using reasonable physical force upon another person to defend . . . a third person from what he reasonably believes to be the use or imminent use of physical force, and he may use such degree of force which he reasonably believes to be necessary for such purpose; except that deadly physical force may not be used unless the actor reasonably believes that such other person is (1) using or about to use deadly physical force, or (2) inflicting or about to inflict great bodily harm."

"The defense of others, like self-defense, is a justification defense. These defenses operate to exempt from punishment otherwise criminal conduct when the harm from such conduct is deemed to be outweighed by the need to avoid an even greater harm or to further a greater societal interest. . . . Thus, conduct that is found to be justified is, under the circumstances, not criminal. . . . All justification defenses share a similar internal structure: special triggering circumstances permit a necessary and proportional response. . . . One common formulation of the necessity requirement gives the actor the right to act when such force is necessary to defend himself [or a third person]. But this formulation fails to highlight the two essential parts of the necessity requirement . . . force should be permitted only (1) when necessary and (2) to the extent necessary. The actor should not be permitted to use force when such force would be equally as effective at a later time and the actor suffers no harm or risk by waiting. . . . Accordingly, neither self-defense, nor the defense of others, encompass[es] a preemptive strike." (Citations omitted; internal quotation marks omitted.) *State* v. *Bryan*, supra, 307 Conn. 832–33.

In asserting a claim of defense of others, the defendant has only the burden of production, meaning that "he merely is required to introduce sufficient evidence to warrant presenting his claim of [defense of others] to the jury." (Internal quotation marks omitted.) Id., 834. "[T]he evidence adduced by the defendant must be sufficient [if credited by the jury] to raise a reasonable doubt in the mind of a rational juror as to whether the defendant acted in [defense of another]." (Internal quotation marks omitted.) Id. The burden of production on the defendant is "slight" and "may be satisfied if there is any foundation in the evidence [for the defendant's claim], no matter how weak or incredible"; (internal quotation marks omitted); and in producing evidence, the defendant "may rely on evidence adduced either by himself or by the state to meet this evidentiary threshold." (Emphasis omitted; internal quotation marks omitted.) Id. "[O]nce a defendant identifies sufficient evidence in the record to support a requested jury charge, he is entitled thereto as a matter of law, even if his own testimony, or another of his theories of defense,

flatly contradicts the cited evidence." Id., 834–35.

Although the defendant's burden may be slight, "[b]efore the jury is given an instruction on [defense of others] . . . there must be some evidentiary foundation for it. A jury instruction on [defense of others] is not available to a defendant merely for the asking. . . . However low the evidentiary standard may be, it is nonetheless a threshold the defendant must cross." (Internal quotation marks omitted.) *State* v. *Montanez*, 277 Conn. 735, 750, 894 A.2d 928 (2006). "Although it is the jury's right to draw logical deductions and make reasonable inferences from the facts proven . . . it may not resort to mere conjecture and speculation." (Internal quotation marks omitted.) *State* v. *Bryan*, supra, 307 Conn. 835; see also *State* v. *Montanez*, supra, 750 ("[t]he defendant may not ask the court to boost him over the sill upon speculation and conjecture" [internal quotation marks omitted]). Additionally, "in order to submit a defense of others defense to the jury, a defendant must introduce evidence that the defendant reasonably believed [the attacker's] unlawful violence to be imminent or immediate. . . . Under § 53a-19 (a), a person can, under appropriate circumstances, justifiably exercise repeated deadly force if he reasonably believes both that [the] attacker is using or about to use deadly force against [a third person] and that deadly force is necessary to repel such attack. . . . The Connecticut test for the degree of force in . . . [defense of others] is a subjective-objective one. The jury must view the situation from the perspective of the defendant. Section 53a-19 (a) requires, however, that the defendant's belief ultimately must be found to be reasonable." (Internal quotation marks omitted.) *State* v. *Bryan*, supra, 835–36.

On the basis of our thorough review of the record, we conclude that the defendant did not cross the low evidentiary threshold to entitle him to a charge on the defense of others and, accordingly, we conclude that the trial court properly refused to instruct the jury on that theory. Adopting the version of the facts most favorable to the defendant, the jury could have reasonably concluded that Bryan had expressed previously his desire to have the victim killed, that he solicited the defendant to kill the victim, that he was angry that the defendant was hesitant to do so, that he threatened the defendant and the victim if the defendant did not kill the victim, and that Bryan had a gun in his possession on that night. This evidence, if credited, could possibly be sufficient to show that the defendant subjectively believed that the victim was at imminent risk of great bodily harm from Bryan, even though there is evidence that this belief was unreasonable.

Regardless of whether the defendant had the subjective belief that the victim was in imminent risk of harm, the evidence, however, was insufficient to support the

defendant's contention that his perception of imminent danger to the victim was *objectively reasonable at the time he fired the gun* so as to justify his claimed belief that it was necessary to do so in order to defend the victim. In short, the evidence does not support a finding that the victim was at imminent risk of great bodily harm from Bryan when she was shot by the defendant. Rather, the evidence was probative of the fact that, after much indecision, the defendant engaged in a preemptive strike against Bryan, an act which is not justified under a defense of others theory. Id., 833.

In support of his claim that his belief of the imminent risk of grave harm to the victim was reasonable, the defendant suggests that there was evidence that Bryan fired a gun from within the victim's car. As support for this contention, he highlights the fact that Walker originally told the police that he heard two gunshots that night and that there was a defect in the car, which the police labeled "bullet hole 2." See footnote 11 of this opinion. Hendrix testified, however, that she did not recover a bullet from within the car, there were no physical indicators that the defect actually was created by a bullet, and that even if the defect had been created by a bullet, she could not say when it was made. Thus, this evidence is wholly insufficient, even when viewed in the defendant's favor, to establish that Bryan fired a gun from within the victim's car, placing her in imminent danger of great physical harm inflicted by Bryan. The only way a jury could come to such a conclusion would be through impermissible conjecture and speculation.

Even if we assume that Bryan did have a second gun that night, which is supported only by the defendant's own testimony, there was no evidence to suggest that Bryan was "using or about to use deadly physical force, or . . . inflicting or about to inflict great bodily harm" upon the victim. General Statutes § 53a-19 (a). There was no evidence that Bryan was pointing the gun at the victim or even that he had it in his hand at the time the defendant fired the gun. Further, there was no evidence that Bryan made any furtive movements to retrieve a weapon. In fact, the defendant testified that at the time he fired the gun at the car, Bryan was leaning over toward the victim, grabbing the steering wheel to help direct the car. Additionally, Bryan was yelling at the victim to drive away, which undermines the defendant's argument that he believed Bryan was about to inflict great bodily harm upon her, as she could not have driven the car away if she was seriously injured.

Additionally, the defendant testified that he went back and forth between Magnolia Street and Enfield Street three times before shooting the gun. Even after Bryan allegedly brandished a nine millimeter gun at the defendant before retreating back to the victim's car, where the victim was sitting, the defendant sat in Bry-

an's car on Magnolia Street "for a minute" before returning to Enfield Street, where he "sat there again for a little bit," then stood behind a parked car while "trying to get up the nerve" to shoot Bryan. In the time between the alleged confrontation with the nine millimeter and the shooting of the victim, the defendant did not seek assistance for the victim from a third party or from the police, even though the Hartford police station was less than five minutes from that location. The fact that the defendant left the victim alone with Bryan, when the defendant knew Bryan was armed, undercuts the notion that one could reasonably believe that the victim was at imminent risk of great bodily harm from Bryan.[12] In short, the defendant's actions in coming and going to and from the scene several times before the shooting erodes any basis for determining that a reasonable person, under these circumstances, could conclude that the victim was in imminent danger of great bodily harm from Bryan at the moment the defendant fired into the vehicle.

Viewed in the light most favorable to the defendant, evidence that Bryan was angry at the time, may have had a gun, was looking to have the victim killed, and threatened to kill the defendant and the victim if the defendant did not kill her, was nevertheless insufficient to satisfy even the slight burden placed on the defendant to show that it would have been objectively reasonable for him to believe that the victim was at imminent risk of having grave bodily harm inflicted upon her by Bryan. At most, the jury could have inferred from such evidence that the victim might be endangered at some point in the future. Thus, no reasonable jury could have found the defendant's belief that the victim was at risk of imminent harm from Bryan at the time the defendant fired the gun to be objectively reasonable. "Viewed in the light most favorable to the defendant, the evidence was insufficient to raise a reasonable doubt in the mind of a rational juror as to whether the defendant acted in [the victim's] defense." *State* v. *Bryan*, supra, 307 Conn. 838–39. Accordingly, the trial court properly refused to instruct the jury as requested on the defendant's defense of others theory.

## II

The defendant claims next that the trial court improperly restricted defense counsel from arguing defense of others and renunciation in closing arguments, thereby violating his right to the effective assistance of counsel under the sixth amendment to the United States constitution. The defendant concedes that this claim is unpreserved, but, nevertheless, seeks review pursuant to *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), as modified by *In re Yasiel R.*, 317 Conn. 773, 781, 120 A.3d 1188 (2015), and the plain error doctrine. See Practice Book § 60-5.

"[A] defendant can prevail on a claim of constitutional

error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation . . . exists and . . . deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt. In the absence of any one of these conditions, the defendant's claim will fail. The appellate tribunal is free, therefore, to respond to the defendant's claim by focusing on whichever condition is most relevant in the particular circumstances." (Emphasis in original; footnote omitted.) *State* v. *Golding*, supra, 213 Conn. 239–40. "The defendant bears the responsibility for providing a record that is adequate for review of his claim of constitutional error. . . . The defendant also bears the responsibility of demonstrating that his claim is indeed a violation of a fundamental constitutional right. . . . Finally, if we are persuaded that the merits of the defendant's claim should be addressed, we will review it and arrive at a conclusion as to whether the alleged constitutional violation . . . exists and whether it . . . deprived the defendant of a fair trial." (Citations omitted.) Id., 240–41.

In the present case, we conclude that the defendant's claim meets the first two prongs of the *Golding* test, as the record is adequate to review the alleged claim of error, and the claim is of constitutional magnitude alleging the violation of a fundamental right. See *State* v. *Arline*, 223 Conn. 52, 63, 612 A.2d 755 (1992) ("The right to the assistance of counsel ensures an opportunity to participate fully and fairly in the adversary factfinding process. . . . The opportunity for the defense to make a closing argument in a criminal trial has been held to be a basic element of the adversary process and, therefore, constitutionally protected under the sixth and fourteenth amendments." [Citation omitted; internal quotation marks omitted.]). Accordingly, the claim is reviewable. We further conclude, however, that the defendant has failed to demonstrate that the alleged constitutional violation exists and deprived him of a fair trial.

The following additional facts are relevant to our resolution of this claim. During the February 10, 2015 charge conference, the defendant filed a request to charge, asking that the court give the jury an instruction on renunciation of criminal purpose as a defense to conspiracy. The court refused to give such an instruction, stating "that there [did] not exist a foundation in the evidence that the defendant took the requisite steps prior to the commission of the offense to deprive his complicity of its effectiveness . . . ."[13] In addition, the defendant asked the court to instruct the jury on the defense of others claim. As discussed in part I of this

opinion, the court correctly denied that request. After the court reviewed the entirety of the jury instructions with the parties, the state requested that defense counsel be precluded from arguing defense of others or renunciation in her closing argument. The court agreed, stating: "I understand that the defense has objected to the court's decisions regarding the request to charge . . . but during closing argument, the parties should not make any arguments relating to defense of others and renunciation. It's not in the case, at this point." Defense counsel did not object to the court's ruling.

Although never using the terms "defense of others" or "renunciation," defense counsel nonetheless argued facts that related to those two theories in her closing argument. Defense counsel argued: "[T]he truth has been told since the very beginning of this case. It would have been simpler and cleaner and nicer for [the defendant] if he could've said: well, yeah, I saw [Bryan] pointing that gun at [the victim]. Or, better: I saw [Bryan] shoot that gun from inside that car. Or: I heard that shot." She also mentioned several more times that there was testimony that two gunshots had been fired that night. She also argued that "one of [the defendant's] stated objectives was to try to protect [the victim]. . . . You can only infer that he was really trying to kill [Bryan] . . . . But we don't have a freeze-frame video component in this case where we can just stop the action and say: yes, [Bryan] has a [nine millimeter gun] and, yes, he's pointed it out because . . . he saw [the defendant] coming up. Or: yes, [Bryan] has a [nine millimeter gun]. He realizes [the defendant] isn't going to kill [the victim] for him, and so he's pointing the [nine millimeter gun] at [the victim]. We don't have the video cameras. That, unfortunately, is life." Additionally, defense counsel commented: "[I]f [the defendant] wanted to see [the victim] dead, he didn't have to do this routine of coming up from behind these cars. He could have walked out of that cut . . . and done what [Bryan] asked him to do, which is unload the [.44 caliber revolver] in the driver's side door of the vehicle, into her. That's not what happened." Further, she argued that "to be a murderer, you would have to know exactly, exactly what [the defendant's] intent was and exactly what [Bryan] was doing at the time."

After closing arguments, the state objected to portions of defense counsel's argument, claiming that she had violated the court's order not to discuss defense of others and renunciation. Defense counsel replied: "I was talking about the evidence when I was saying [he was] there to protect [the victim] or [he was] there to protect himself. [The court] ruled essentially that . . . the evidence did not support any of those defenses, so I didn't say the defenses. I just said what the evidence was. . . . I talked about the evidence instead of the defenses." The court overruled the state's objection and stated that it did not think defense counsel had

breached the court's order.

On appeal, the defendant argues that the court improperly restricted his closing argument by disallowing defense counsel from arguing defense of others and renunciation, thereby violating his right to the effective assistance of counsel under the sixth amendment. We are not persuaded.

"In general, the scope of final argument lies within the sound discretion of the court . . . subject to appropriate constitutional limitations. . . . It is within the discretion of the trial court to limit the scope of final argument to prevent comment on facts that are not properly in evidence, to prevent the jury from considering matters in the realm of speculation and to prevent the jury from being influenced by improper matter that might prejudice its deliberations. . . . While we are sensitive to the discretion of the trial court in limiting argument to the actual issues of the case, tight control over argument is undesirable when counsel is precluded from raising a significant issue." (Citations omitted; internal quotation marks omitted.) *State* v. *Arline*, supra, 223 Conn. 59–60. "Counsel may comment upon facts properly in evidence and upon reasonable inferences drawn from them. . . . Counsel may not, however, comment on or suggest an inference from facts not in evidence." (Citation omitted; emphasis omitted; internal quotation marks omitted.) Id., 58.

In arguing that the court erred in limiting his closing argument, the defendant relies on our Supreme Court's holding in *Arline* and states that the facts in that case are "nearly identical" to the facts in the present case. The defendant's reliance on *Arline*, however, is misplaced. In *Arline*, the court precluded defense counsel from referring during closing argument "to any charges against the complainant that had been nolled or disposed of subsequent to the alleged sexual assault or to any civil claim that the complainant might pursue with respect to the alleged sexual assault." *State* v. *Arline*, supra, 223 Conn. 57. The defendant in *Arline* argued that those facts "supported an inference that the complainant's testimony had been motivated by these potential benefits" which he would have used, in closing, to challenge the complainant's credibility. Id., 58. Our Supreme Court found error in that case because the trial court restricted defense counsel from commenting on those facts which were properly in evidence. Id., 63–64.

Here, unlike in *Arline*, defense counsel was precluded from discussing her *legal theories* of the case that the court had already ruled were unsupported by the evidence. The court did not preclude defense counsel from arguing facts elicited at trial, but precluded her from arguing that those facts supported the legal theory that the defendant shot the victim in trying to protect her from Bryan, or that the defendant

renounced his participation in the conspiracy. Indeed, when the state objected to portions of defense counsel's closing argument, defense counsel argued, "I was talking about the evidence when I was saying [he was] there to protect [the victim] or [he was] there to protect himself. [The court] ruled essentially that . . . the evidence did not support any of those defenses, so I didn't say the defenses. I just said what the evidence was. . . . I talked about the *evidence* instead of the *defenses*." (Emphasis added.)

It is clear from her statements in closing arguments, as well as in her argument opposing the state's objection to her closing argument, that defense counsel understood the distinction between arguing the facts in evidence and arguing the precluded theories of defense of others and renunciation. As to the claim of defense of others, defense counsel argued that the defendant was trying to protect the victim from Bryan, that there were two gunshots that night, and that the case would have been much cleaner if the defendant had testified that Bryan had a gun and was pointing it at the victim, which all speaks to his theory of defense of others. Additionally, defense counsel highlighted the defendant's renunciation, without specifically saying the word, when she argued that the defendant could have done what Bryan asked him to do that night, but did not. She argued that in order for the defendant to be a murderer, the jury would need to know his intent and Bryan's actions. Implicit in that argument is that the defendant's intent was to change the plan and shoot Bryan, not the victim, which is the crux of the defendant's renunciation argument. Also implicit in that argument is the contention that Bryan's actions placed the victim in imminent harm that night, and, therefore, that the defendant was justified in shooting at Bryan to defend her. Given this, defense counsel understood the distinction and knew that under the court's ruling she could, and indeed did, comment on the *facts properly in evidence*, without taking the next step to discuss defense of others and renunciation, which the court already had ruled were unsupported by the evidence. Accordingly, the defendant cannot show that "the alleged constitutional violation . . . exists and . . . deprived the defendant of a fair trial"; *State* v. *Golding*, supra, 213 Conn. 240; and, thus, this claim fails to satisfy the third prong of *Golding*.

The defendant asserts, in the alternative, that his claim is reviewable under the plain error doctrine. "This doctrine, codified at Practice Book § 60-5, is an extraordinary remedy used by appellate courts to rectify errors committed at trial that, although unpreserved, are of such monumental proportion that they threaten to erode our system of justice and work a serious and manifest injustice on the aggrieved party. [T]he plain error doctrine . . . is not . . . a rule of reviewability. It is a rule of reversibility. That is, it is a doctrine that

this court invokes in order to rectify a trial court ruling that, although either not properly preserved or never raised at all in the trial court, nonetheless requires reversal of the trial court's judgment, for reasons of policy. . . . In addition, the plain error doctrine is reserved for truly extraordinary situations [in which] the existence of the error is so obvious that it affects the fairness and integrity of and public confidence in the judicial proceedings. . . . Plain error is a doctrine that should be invoked sparingly. . . . Implicit in this very demanding standard is the notion . . . that invocation of the plain error doctrine is reserved for occasions requiring the reversal of the judgment under review. . . . [Thus, a defendant] cannot prevail under [the plain error doctrine] . . . unless he demonstrates that the claimed error is both so clear and so harmful that a failure to reverse the judgment would result in manifest injustice." (Citations omitted; internal quotation marks omitted.) *State* v. *Myers*, 290 Conn. 278, 289, 963 A.2d 11 (2009).

Upon review of the entire record, we conclude that plain error relief is unwarranted. The defendant has failed to show that the court's limited restriction on his closing argument "was so obviously erroneous that it affected the fairness or integrity of or public confidence in the judicial proceedings." *State* v. *Thompson*, 71 Conn. App. 8, 14, 799 A.2d 1126 (2002). Further, the defendant has failed to show that "this is one of those extraordinary situations where not granting the requested relief will result in manifest injustice." Id. Accordingly, the court did not abuse its discretion in limiting the defendant's closing argument.

III

Last, the defendant claims that the court gave the jury a faulty and misleading instruction on conspiracy, and seeks to have his conviction of conspiracy to commit murder reversed on that basis. Specifically, the defendant claims that the court "failed to instruct that [the] defendant had to specifically intend to enter into an agreement to commit murder." The defendant concedes that this claim is unpreserved, but, nevertheless, seeks review pursuant to *State* v. *Golding*, supra, 213 Conn. 239–40. We conclude that the defendant has waived any challenge to the relevant jury instruction, pursuant to *State* v. *Kitchens*, 299 Conn. 447, 10 A.3d 942 (2011), and, therefore, is not entitled to *Golding* review.

The following additional facts are relevant to our resolution of this claim. At the February 10, 2015 charge conference, the court noted that it had provided defense counsel and the state with two different drafts of the proposed jury instructions, one on February 5, 2015, and the second on February 10, 2015. In both drafts, the subsection regarding the "agreement" element of conspiracy to commit murder provided, inter alia: "The first element is that there was an agreement between

two or more persons. It is not necessary for the state to prove that there was a formal or express agreement between them. It is sufficient to show that the parties *knowingly engaged* in a mutual plan to do a criminal act. . . . [T]he first element that the state must prove beyond a reasonable doubt is that the defendant *entered into an agreement* with at least one other person to engage in conduct constituting murder." (Emphasis added.) In addition, in summarizing the elements of conspiracy to commit murder, the two drafts provided: "In summary, the state must prove beyond a reasonable doubt that . . . the defendant *specifically intended* to cause the death of another person." (Emphasis added.) The language used in the drafts came from the model jury instructions on the Judicial Branch website at the time of the conference. Neither the defendant nor the state objected to the use of any of this language.

The state did object to a different portion of the proposed conspiracy charge, arguing that it was unnecessary to include language that the state need not show that the defendant directly communicated with his coconspirators, or that they even knew each other's names, as this was irrelevant under the facts of the present case. The defense agreed with the state. After agreeing to take that language out, the court then stated: "Okay. All right. So that looks good. All right. Any other issues with count two language?" Neither party indicated that it had any further changes to count two, and the court moved on to discuss the proposed language for count three of the information, which charged the defendant with criminal possession of a firearm.

The following day, February 11, 2015, the court instructed the jury and used the conspiracy language that it had provided in the draft instructions, including the previously mentioned language in the subsection on agreement, as well as the language in the summary paragraph. After the court read the entirety of the instructions to the jury, the defendant renewed his objections made during the charge conference, none of which were in regard to the conspiracy count, and he did not make any additional objections.

On appeal, the defendant argues that the court's instruction to the jury on count two, conspiracy to commit murder, was "faulty and misleading." Specifically, he argues that the use of the language regarding the agreement element as well as the language in the summarizing paragraph was in error because the court failed to instruct the jury that the defendant had to "specifically intend to enter into an agreement to commit murder." We conclude that the defendant has waived this claim.

"It is well established in Connecticut that unpreserved claims of improper jury instructions are reviewable under *Golding* unless they have been induced or implicitly waived. . . . The mechanism by which a

right may be waived . . . varies according to the right at stake. . . . For certain fundamental rights, the defendant must personally make an informed waiver. . . . For other rights, however, waiver may be affected by action of counsel . . . [including] the right of a defendant to proper jury instructions. . . . Connecticut courts have consistently held that when a party fails to raise in the trial court the constitutional claim presented on appeal and affirmatively acquiesces to the trial court's order, that party waives any such claim [under *Golding*]. . . . [W]hen the trial court provides counsel with a copy of the proposed jury instructions, allows a meaningful opportunity for their review, solicits comments from counsel regarding changes or modifications and counsel affirmatively accepts the instructions proposed or given, the defendant may be deemed to have knowledge of any potential flaws therein and to have waived implicitly the constitutional right to challenge the instructions on direct appeal. . . . [C]ounsel's discussion of unrelated parts of the jury charge at an on-the-record charge conference . . . demonstrate[s] that counsel was sufficiently familiar with the instructions to identify those portions of the instructions with which [she] disagreed. [T]o the extent that [she] selectively discussed certain portions of the instructions but not others, one may presume that [she] had knowledge of the portions that [she] did not discuss and found them to be proper, thus waiving the defendant's right to challenge them on direct appeal." (Citations omitted; internal quotation marks omitted.) *State v. Herring*, 151 Conn. App. 154, 169–70, 94 A.3d 688 (2014), aff'd, 323 Conn. 526, 147 A.3d 653 (2016), citing *State v. Kitchens*, supra, 299 Conn. 447. Our Supreme Court has stated that it is sufficient to show that defense counsel had a meaningful opportunity to review the proposed instructions if she was given the opportunity to review them overnight. See *State v. Webster*, 308 Conn. 43, 63, 60 A.3d 259 (2013).

In the present case, defense counsel was provided a first draft of the instructions on February 5, 2015, four days prior to the charge conference and, accordingly, had a meaningful opportunity to review the proposed jury instructions at issue. Additionally, defense counsel discussed and objected to other portions of the jury instructions at the charge conference, and, therefore, it is presumed that she had knowledge of the language in question, even though she did not discuss explicitly that portion of the proposed instructions during the charge conference. See *State v. Herring*, supra, 151 Conn. App. 170. We conclude that the defendant had a meaningful opportunity to review the jury instruction at issue, failed to object to that instruction, and, therefore, waived his right to challenge the instruction on appeal.[14]

The judgment is affirmed.

In this opinion the other judges concurred.

[1] The defendant originally appealed to our Supreme Court pursuant to

General Statutes § 51-199 (b) (3). The appeal subsequently was transferred to this court pursuant to Practice Book § 65-1.

[2] At various times during trial, the victim was referred to as Bryan's girlfriend, his "[p]art-time girlfriend," his "side girlfriend," and his "jump-off," which is a term for a person used for sex.

[3] In his testimony, the defendant stated that these events happened during the morning of April 29, 2013, but it is clear from his testimony that this was a mistake and that he was actually talking about April 28, 2013.

[4] Early testified that he received information about the robbery from Bryan and the defendant's cousin, Everett Walker, and then spoke with Manchester police, but did not testify as to the content of the information he was given.

[5] General Statutes § 53a-54a (a) provides in relevant part: "A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person or of a third person . . . ."

[6] General Statutes § 53a-48 (a) provides: "A person is guilty of conspiracy when, with intent that conduct constituting a crime be performed, he agrees with one or more persons to engage in or cause the performance of such conduct, and any one of them commits an overt act in pursuance of such conspiracy."

[7] General Statutes § 53a-217 (a) provides in relevant part: "A person is guilty of criminal possession of a firearm . . . (1) when such person possesses a firearm . . . and . . . has been convicted of a felony committed prior to, on or after October 1, 2013 . . . ."

[8] The defendant also initially asked that the jury be instructed on self-defense, but decided not to pursue that request at the charging conference.

[9] The court charged the jury on transferred intent. The court stated: "The evidence in this case raises the issue of transferred intent. The principle of transferred intent was created to apply to the situation of an accused who intended to kill a certain person and by mistake killed another. His intent is transposed from the person to whom it was directed to the person actually killed. It is not necessary for a conviction of murder that the state prove that the defendant intended to kill the person whom he did in fact kill. It is sufficient if the state proves that, acting with the intent to kill a person, he in fact killed a person."

[10] As part of his argument that the court should have given the jury a defense of others instruction, the defendant claims that the court "did not view the evidence in a light most favorable to [the] defendant. Had it done so, it would have realized there was sufficient evidence to raise a reasonable doubt that [the] defendant acted in defense of [the victim], and that he reasonably believed deadly force was necessary to defend [the victim] against the imminent use of deadly force by [Bryan]."

Essentially, the defendant argues that because the court did not find in his favor on this issue, it *must* have used the incorrect standard. This argument is unavailing, as there is evidence that the court did, in fact, view the evidence in the light most favorable to the defendant in denying his request for the instruction. First, the defendant reminded the court of the correct standard during argument requesting the instruction. Second, the court stated that it was relying primarily on three cases in making its decision, all of which provided the appropriate standard: *State* v. *Bryan*, 307 Conn. 823, 836, 60 A.3d 246 (2013); *State* v. *Lewis*, 220 Conn. 602, 619, 600 A.2d 1330 (1991); and *State* v. *Singleton*, 292 Conn. 734, 746, 974 A.2d 679 (2009). Third, the court specifically stated that it waited to make its decision until after the defendant testified and evidence was concluded. Accordingly, there is no merit to the defendant's contention that the court applied the wrong standard.

[11] In response, defense counsel argued that there was objective evidence that Bryan pulled out a firearm because there was the hole in the A-pillar of the car that the police had labeled "bullet hole [number] 2." The court replied that "that infers there was more than one shot fired, and that's not necessarily consistent with the evidence, either." Defense counsel further argued that there was evidence of a second gunshot because Walker testified that in his original statement to the police, he said that he heard two gunshots. The court noted that argument and moved on.

[12] The evidence suggests further that Bryan's plan was to have the victim killed before she became seven months pregnant so that the fetus was not "liable as another body." At the time of her death, the victim was nineteen weeks, almost five months, pregnant. Though this does not necessarily prove that Bryan would have waited two more months to plan the victim's murder, it is illustrative evidence to further undermine the defendant's argument that the victim was in imminent harm.

[13] The defendant does not challenge this decision on appeal.

[14] The defendant argues in his reply brief that his claim cannot be waived pursuant to *Kitchens* because the model jury instructions were revised on March 4, 2015, after he was convicted, to include language regarding a defendant's specific intent to enter into an agreement. The defendant argues, therefore, that this "substantive change" to the model jury instructions should apply retroactively to pending cases, just as "substantive changes to the law" would. This argument is unavailing.

The preamble to the model jury instructions expressly provides: "This collection of jury instructions . . . *is intended as a guide* for judges and attorneys . . . . The use of these instructions in entirely discretionary and their publication by the Judicial Branch is *not a guarantee of their legal sufficiency*." (Emphasis added.) Connecticut Criminal Jury Instructions (4th Ed. 2008) preamble, available at http://www.jud.ct.gov/ji/Criminal/Criminal.pdf (last visited October 11, 2017) (copy contained in the file of this case in the Appellate Court clerk's office). Accordingly, if defense counsel believed that the statement of law provided in the jury instructions was incorrect, she was obligated to object to its use, which she did not.

In fact, defense counsel did object at the charge conference to another portion of the proposed instructions, regardless of the fact that it was from the model jury instructions. In discussing the proposed instructions on count one, murder, defense counsel objected to the language in the draft which provided: "This means that the defendant's conduct was the proximate cause of the decedent's death. You must find it proved beyond a reasonable doubt that [the victim] died as a result of the actions of the defendant." Defense counsel argued that the court "[states] that sentence as if [the court is] making a conclusion for the jury. It's confusing and I'm objecting to [the] language." The court stated that it was using the language from the model jury instructions to which defense counsel replied, "I still have the same problem with it even though it's the model jury instructions. . . . So, I am objecting." The court noted the objection and used the language as proposed in its instructions. Defense counsel knew, therefore, that regardless of the origin of the language used by the court in the proposed instructions, she was obligated to object if she felt it was a misstatement of law.

―――――――――――――――――――